## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BRIAN R. WOLFF**<br>321 RICHARD RD.<br>YARDLEY, PA 19067<br><br>*Plaintiff*,<br><br>v.<br><br>**NEWSWEEK, LLC**<br>7 HANOVER SQUARE, 5TH FLOOR<br>NEW YORK, NY 10004<br><br>and<br><br>**IBT MEDIA, INC.**<br>7 HANOVER SQUARE, 5TH FL<br>NEW YORK, NY 10004<br><br>and<br><br>**Does 1-10**<br><br>*Defendants*. | CIVIL ACTION NO.  16-CV-____<br><br><br><br><br><br><br><br><br><br>Jury Trial Demanded |

## COMPLAINT FOR COPYRIGHT INFRINGEMENT

Plaintiff Brian R. Wolff ("Mr. Wolff" or "Plaintiff") complains against Newsweek, LLC ("Newsweek") and IBT Media, Inc. ("IBT"), and Does 1-10, seeking monetary relief, alleging as follows:

1.  This is an action for direct and contributory copyright infringement of a professional photographer's work arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq.

## JURISDICTION AND VENUE

2. This court has subject matter jurisdiction over the copyright infringement claim, with jurisdiction vested in this Court pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1338(a) (acts of Congress relating to copyrights).

3. This Court has personal jurisdiction over the Defendants because they do continuous and systematic business in the Commonwealth of Pennsylvania such that they should expect to be haled into its courts, the license for use of the subject photographs was formed in Pennsylvania, and Defendants committed intentional acts of copyright infringement directed towards and causing harm to Plaintiff's property within Pennsylvania.

4. Venue is proper pursuant to 28 U.S.C. § 1400 (venue in copyright actions) as Defendants may be found in this District where it is subject to the Court's jurisdiction. In addition, venue is proper under 28 U.S.C. 1391(2) as a substantial part of the property that is the subject of the action is situated here and a substantial part of the events giving rise to the claim occurred here.

## THE PARTIES

5. Mr. Wolff is a professional free-lance photographer with a principal place of business in Yardley, Pennsylvania.

6. Mr. Wolff has almost 40 years of experience as a professional photographer whose clients have included the *Los Angeles Times, Time Magazine, Paris Match*, the US Navy, Lockheed Martin, BAE Systems (formerly United Defense), The Navy League, Raytheon, DRS Technologies, and many other editorial and commercial clients.

7. Mr. Wolff's images have also appeared world-wide in magazines such as *Smithsonian*, *Life*, *Paris-Match*, *Le Figaro*, and *Stern* as covers, feature editorials and advertisements. Mr. Wolff's photographic subjects are diverse and have included Barbie dolls for the cover of *Smithsonian*, portraits of noted celebrities, prominent scientists and authors, the landing a helicopter in an active volcano, and documenting all aspects of the U.S. military as the Photographer in Residence for the U.S. Naval Institute Press. He has developed a market niche as photographer of naval subjects, defense industries and high technology and he licenses his work for a variety of uses including Annual Reports of corporations in the defense industry. Mr. Wolff's works are commercially licensed. Mr. Wolff has also published two photographic books on the U.S. Navy. One, titled <u>From The Sea: The U.S. Navy And Marine Corps, Into The 21st Century</u> (Osprey Publishing, Ltd., 1997), was co-authored with John Alexander, Commander USN, Ret. The second, <u>Riders Of The Storm: A Photographic Tribute To America's Surface Warriors</u> (International Intellectual Property, Inc., 2000), was authored by Mr. Wolff with an Introduction by Michael G. Mullen, Admiral, USN, Ret., later 17th Chairman of the Joint Chiefs of Staff.

8. Despite his specialization in military photography, Mr. Wolff has never been a government employee and he has never contracted to transfer the copyright in any of his works to any government entity. He has, however, granted free non-exclusive licenses to government entities in consideration of their cooperation with his efforts.

9. Mr. Wolff continues to work as a free-lance photographer and videographer.

10. Throughout his career, Mr. Wolff was diligent in registering the copyright in his works. He carefully restricted the scope of licenses regarding time of use, kinds of uses permitted (e.g., print only, electronic, editorial, advertising, etc.), and often in geographic territory, because he required additional payment from licensees for additional publication rights in order to stay in business as an independent photographer. Mr. Wolff strives to enforce his property rights in an unapologetic effort to monetize the work product of his career.

11. Defendant, Newsweek, LLC, is, on information and belief, a New York limited liability corporation that by itself, or by a predecessor entity, published Newsweek Magazine and, on July 31, 2014, the website Newsweek.com. It also, on information and belief, controls the social media sites twitter.com/Newsweek and www/facebook.com/Newsweek.

12. On information and belief, Newsweek systematically republishes the copyrighted work of photographic contributors in Newsweek.com and in its various social media feeds regardless of restrictions on republication set forth in the licenses by which Newsweek induced the copyright owners to license their work for its original use.

13. Newsweek's unlicensed republications do not revise and republish entire collective works such as magazine issues pursuant to the revision privilege of section 201(c) of the Copyright Act. On the contrary, Newsweek made entire new editorial uses of one of Mr. Wolff's photographs without a license to do so.

14. Defendant, IBT Media, Inc., is on information and belief a New York corporation with a principal place of business at 7 Hanover Square, 5th FL, New York, NY 10004.

15. On information and belief, IBT Media, Inc., was the owner of Newsweek, LLC, on July 31, 2014.

16. On information and belief, IBT Media either directly supervised and participated in Newsweek's infringing activity, or contributed to the infringement, or managed Newsweek in reckless disregard of Newsweek's misconduct.

## MR. WOLFF CREATED THE PROTECTED WORK IN ORDER TO EXPLOIT HIS COPYRIGHT THEREIN THROUGHOUT ITS TERM

17. Throughout his career, Mr. Wolff developed a professional niche by negotiating exclusive access to some site or source in order to market photographs that could not be replaced by available substitutes. His object was to find exclusive stories, both in subject and in potential visual interest, in order to realize the monetary value of his work.

18. In 1994 Mr. Wolff noticed interest in tropical-sourced infectious diseases following the publication of The Hot Zone by Richard Preston, based on that writer's earlier *New Yorker* articles on the subject. He also knew that a film that appeared as "Outbreak" was in production and might create broader interest in such diseases and the measures used to contain them. He then began looking for a suitable photographic subject to depict the issue.

19. Mr. Wolff contacted the U.S. Army Medical Research Institute of Infectious Diseases ("USAMRIID"), which figured in the Preston reports and in the Hot Zone film, seeking access to their facilities in Frederick, Maryland. According to his normal practice, he initially visited the site without his camera to establish relationships with personnel, then visited several times, eventually gaining access to a biosafety level 4 laboratory. This was an exceptional development as the lab had to be scrubbed for Mr.

Wolff's entry then resealed after his departure.

20.     Mr. Wolff was never a government employee at any time in his career and he did not contract with the government to take the USAMRIID photographs.  He came up with the idea and gained access to the closed government site through his journalistic efforts.

21.     Initially, Mr. Wolff discussed the project with Le Figaro Magazine, to which he granted a non-exclusive license which was not exercised.  He then marketed the images and the idea for an accompanying story to Newsweek.  Newsweek agreed to license his images and assigned writers to develop the ideas for a story on the threat and control of infectious diseases which Mr. Wolff suggested.

22.     As a photojournalist, Mr. Wolff pitches story ideas *gratis* and claims no compensation or credit for the ideas.  By contrast, he has always zealously asserted his rights in his photographic works which he protects by written license agreements, copyright registrations, and demands that publishers print copyright notices in connection with their use of his works.

## MR. WOLFF EXPLOITED HIS COPYRIGHT IN HIS IMAGES

23.     On May 10, 1995, Mr. Wolff agreed to permit Newsweek to publish his USAMRIID photographs (the "Protected Works") for "story on Ebola virus" subject to specific, clearly and conspicuously stated "USAGE RIGHTS."   Newsweek guaranteed a $5,000 payment for "inside use" and promised to pay an additional $1,500 if it chose to use any of the Protected Works on the cover.  The license granted was for "ONE TIME NON EXCLUSIVE EDITORIAL RIGHTS."  Newsweek bargained for and was granted a right of first use over its listed competitors: *Time, Sports Illustrated, People, Life* and

*US News* for a period of one week. As to remaining rights, it agreed that "ALL OTHER RIGHTS ARE RESERVED." Newsweek also bargained for, and Mr. Wolff agreed to grant, an additional right to use the cover with his image in advertising only for the on-sale period of the magazine should Newsweek decide to use his work on its cover. The parties contemplated the issue of non-paper uses and the license specifically stated that "NO ELECTRONIC RIGHTS ARE GRANTED." The License further provided that "[a]ll Photographs ARE (c) PHOTOGRAPHERS NAME / IIPI, ALL RIGHTS RESERVED."  *See* License Agreement/Invoice # 19332 at Exhibit "1."

24. Based on those detailed negotiated inducements, several of which were required by Newsweek, Mr. Wolff granted Newsweek a one-time limited license to use his work for editorial purposes.

25. Newsweek paid Mr. Wolff the $5,000 as agreed pursuant to License Agreement/Invoice # 19332.

26. On May 17, 1995, Mr. Wolff issued additional license # 19336 to accommodate Newsweek's request to use one of the Protected Works on its cover. Once again, the scope of the licensed uses was clearly circumscribed to "ONE TIME EXCLUSIVE EDITORIAL COVER RIGHTS US EDITION, TO INCLUDE COVER ON LINE FOR 3 WEEKS. The license specifically provided that "ALL OTHER RIGHTS ARE RESERVED." It again provided for the specific first publication provisions that Newsweek sought as against it named competitors. The additional payment due for the additional use was $1,500. The License further provided that "[a]ll Photographs ARE (c) PHOTOGRAPHERS NAME / IIPI, ALL RIGHTS RESERVED." *See* License Agreement/Invoice # 19336 at Exhibit "2."

27. Newsweek paid Mr. Wolff the $1,500 as agreed pursuant to License Agreement/Invoice # 19336 for the additional use of the Protected Work.

28. On May 17, 1995, Mr. Wolff issued a third license # 19337 to accommodate Newsweek's request to use one of the Protected Works for a cover story on the Ebola virus for its Pacific and Latin American editions. The geographic scope of the use license is extended, but is not unlimited. It is still a "ONE TIME" publication right and "ALL OTHER RIGHTS ARE RESERVED" to the copyright owner. The License further provided that "[a]ll Photographs ARE (c) PHOTOGRAPHERS NAME / IIPI, ALL RIGHTS RESERVED." *See* License Agreement/Invoice # 19337 at Exhibit "3."

29. Newsweek paid Mr. Wolff the additional $1,000 as agreed pursuant to License Agreement/Invoice # 19337 for the additional use of the Protected Work.

30. On May 22, 1995, Newsweek published an issue of its magazine with a close-up of one of the Protected Works on its cover and another photograph on page 55 in the interior article (the "Protected Work"). *See* copy of cover and article at Exhibit "4."

31. The table of contents page of the May 22, 1995 issue of Newsweek set forth a copyright notice as follows: "COVER: Photograph by © Brian R. Wolff shows simulation of handling of the Ebola virus in a biosafety level 4 lab at the U.S. Army Medical Research Institute of Infectious Diseases." *Id.*

32. Page 55 set forth a copyright notice as follows: "© Brian R. Wolff." *Id.*

33. Mr. Wolff registered his images from the Ebola shoot as copyright number VA 742-565 effective July 17, 1995. *See* Certificate of Registration at Exhibit "5."

**NEWSWEEK INFRINGED MR. WOLFF'S COPYRIGHT**

34. On or about July 31, 2014, Newsweek published a new, on-line article titled "Newsweek Rewind: The Ebola Outbreak of 1995." That article was illustrated by a republication of the May 22, 1996 Newsweek cover that used Mr. Wolff's photograph (the "Infringing Work"). *See* the Infringing Work at Exhibit "6."

35. The Infringing Work is maintained on Newsweek's server at http://www.newsweek.com/newsweek-rewind-ebola-outbreak-1995-262234.

36. The Infringing Work republished one of the Protected Works that Newsweek originally published on its cover in 1995 pursuant to License Agreement # 19336.

37. License agreement # 19336 provided for a "ONE TIME" use that permitted on-line publication "FOR 3 WEEKS" for the U.S. edition. It further provided that "ALL OTHER RIGHTS ARE PRESERVED."

38. License agreement # 19332, pertaining to both a guaranteed inside use and a possible cover use of the Protected Works, permitted "ONE TIME" use and stated: "NO ELECTRONIC RIGHTS ARE GRANTED."

39. In addition, License Agreement # 19337 also permitted a "ONE TIME" use for cover on the Pacific and Latin American editions, with no provision for on-line use.

40. On information and belief, Newsweek has published an electronic version of an image from the Protected Work on-line since July, 31, 2014 throughout the world without geographic restriction.

41. Newsweek did not seek a license from Mr. Wolff for its additional use of his work in an on-line, unlimited republication of his Protected Work.  He has, at all times, done business at the same address at which Newsweek dealt with him in 1995. Indeed, Newsweek republished his work surreptitiously without even notifying him that it had done so notwithstanding the copyright notice it published in 1995 in connection with his work that was used by *Newsweek* for its cover.

42. The unlicensed Infringing Work consists of the original, properly-licensed 1995 cover displayed against a background consisting of a "blown up" part of Mr. Wolff's photograph.

43. One of the exclusive rights vesting initially in authors of protectable works under the Copyright Act of 1976 is the right to make a derivative work using the protected work.

44. None of the three licenses granted Newsweek permission to create a derivative work using Mr. Wolff's work.

45. The Infringing Work contains, within the text of the article, advertisements soliciting subscriptions to the magazine.

46. The Infringing Work displays, on its right side, a constantly updated set of third party advertisements.  Below the article it displays a constantly updated set of "Sponsored Topics" and "Promoted Links."

47. Though it did not relicense its use of the Protected Works from Mr. Wolff, Newsweek exploited the Protected Works for its commercial gain.

48. In addition to republishing Mr. Wolff's work on-line on its own web site notwithstanding the express prohibition on such on-line or electronic uses in written

Licenses Agreements, Newsweek further posted the Infringing Work to social media to drive viewer traffic and advertising revenue to itself without making any payment to the owner of the image it exploited.  *See* post to Newsweek's Twitter feed at Exhibit "7" and to its Facebook account at Exhibit "8."

**When Mr. Wolff Discovered Newsweek's Infringement, Newsweek Refused Mr. Wolff's Offer to Back-license His Work to It, Made Misleading Statements, and Threatened Him in an Effort to Bully Him Out of His Rights under the Copyright Act, and It Refused to Take Down the Infringing Work**

49. In November, 2015, Mr. Wolff discovered Newsweek's infringing use of his work beyond the scope of the License Agreements by means of an internet "crawler" program that permitted him to discover stolen copies of his property published without license by pirate publishers.

50. He wrote a cease and desist letter to Newsweek's general counsel advising him that he had discovered its unlicensed use of his work.  Thinking that the infringement may have been non-willful, he offered to back-license the image to Newsweek.  *See* letter from Mr. Wolff to Ltai Maytal, Esquire, at Exhibit "9."

51. Newsweek responded by letter dated November 19, 2015.  *See* letter from Attorney Maytal to Mr. Wolff at Exhibit "10."

52. Newsweek refused to back-license its infringing use of Mr. Wolff's work, refused to take it down, and threatened him as follows: "[T]he firm with which I was until recently associated, recovered 100 percent of its attorneys' fees as a prevailing defendant in a copyright action. See SOFA Entm't, Inc. v. Dodger Prods., Inc., 709 F.3d 1273 (9th Cir. 2013) ($155,000 attorney's fee award granted against copyright plaintiff on the basis of a fair use defense)."  The case misleadingly cited to an unrepresented layperson for *in terrorem* effect involved an historical documentary film maker's seven

second clip from the *Ed Sullivan Show*. It has nothing to do with a licensee exceeding the scope of a written license by uses that were expressly excluded from the license by which the licensee acquired some uses of the work. In making his bullying threat to a photographer seeking to negotiate a back-license for an unauthorized use of his work, Newsweek's lawyer's volunteered legal advice to Mr. Wolff misstated the applicable Second Circuit law on copyright fee shifting. *See Matthew Bender & Co., Inc. v. W. Pub. Co.*, 240 F.3d 116, 122 (2d Cir. 2001) ("the imposition of a fee award against a copyright holder with an objectively reasonable litigation position will generally not promote the purposes of the Copyright Act.")

53. Mr. Wolff then telephoned Attorney Maytal in a further attempt to negotiate a license for Newsweek's unlicensed use of his Protected Work. Attorney Maytal, however, said he was too busy to speak to Mr. Wolff and did not wish to discuss anything with him in any event. He advised Mr. Wolff, an unrepresented layperson, to state his position in writing.

## Summary of Facts

54. Newsweek originally acquired some uses of Mr. Wolff's work by three separate bargained-for and reciprocal written licenses that expressly provided for "one time" use and expressly prohibited "electronic" and "on-line" uses other than for a three week period following publication. Newsweek repeatedly bargained for license extensions with Mr. Wolff and made additional payments for additional uses that he agreed to license. It printed Mr. Wolff's copyright notices in the 1995 issue as required by the License Agreements. When it went back to prepare its 2014 article, it saw the copyright notices from 1995 that the License Agreements required Newsweek to print. It cannot now be heard to say that it did not know that it needed an additional license in

order to make any new use of the work, particularly a use that it expressly agreed not to make when it acquired the work by accepting the licenses. Its solution was to make the desired additional use Mr. Wolff's work without telling him. Newsweek's belated assertions of a right to make unlicensed use of a photojournalist's work only arose after it was caught infringing.

55. For his part, Mr. Wolff took all reasonable actions to forestall precisely this conflict. He issued a written License Agreement to Newsweek that dealt with precisely the additional and on-line uses that are now at issue (and that also granted accommodations that Newsweek negotiated for). Even after discovering surreptitious infringement, in a period of time when professional photographers are beggared by on-line piracy, Mr. Wolff attempted to reestablish a professional, business-like relationship with a publisher that had, previously, bargained in good faith for additional uses of the work, to the benefit of both author and licensee. In response, Newsweek spurned his offer to deal; bullied him with volunteered, spurious legal advice; and refused to cease its infringements from which it continued to extract advertising revenue and viewer traffic.

56. Infringements of copyright may be found "willful" if a sophisticated commercial infringer does not establish procedures to ensure that its use of licensed photographic works do not exceed the scope of the licenses granted by the copyright owners, and if it does in fact exceed the scope of licenses granted by the plaintiff and by non-party authors even if those infringements have gone undiscovered by their victims. Furthermore, continued infringing activity even after the victimized owner notifies the infringer of its misconduct can further support a finding of willfulness.

57.     When notified of its infringements by Mr. Wolff, Newsweek refused to cease its misconduct.  It continued to exploit Mr. Wolff's work without a license for its own commercial benefit.

58.      On information and belief: (i) Newsweek's purpose in republishing works without a license, after having previously sought licenses for additional uses when it knew the owner was watching, is to avoid paying the license fees due to the owner of the republished photographic work; (ii) Newsweek's inventory department lacked a license compliance program during the relevant time period such that it  it systematically exploited copyright owners' works in excess of the licenses granted to it; and (iii) Newsweek continued to make infringing use of Mr. Wolff's work  beyond the scope of its licenses, even after he contacted it with a cease and desist demand, betting that it could bully him with threatening and misleading volunteered legal advice.   Its infringements are willful.

## COUNT I

### *Mr. Wolff v. All Defendants*
**(Copyright Infringement, 17 U.S.C. § 501)**

59.     Plaintiff incorporates by reference all the allegations of paragraphs 1 through 58.

60.     Mr. Wolff is the author and copyright owner of the Protected Work.

61.     Defendants have reproduced, displayed, made a derivative work, distributed or otherwise copied the Protected Work beyond the scope of the license granted to Newsweek by Mr. Wolff.

62.     The actions and conduct of Defendants as described above infringe upon the exclusive rights granted to photographers under 17 U.S.C.A. 106 to display,

reproduce and distribute their work to the public. Such actions and conduct constitute copyright infringement under the Copyright Act of 1976, 17 U.S.C.A. 501.

63. Mr. Wolff has complied in all respects with 17 U.S.C. §§ 101 et seq., and secured and registered the exclusive rights and privileges in and to the copyrights of the above-referenced works pursuant to 17 U.S.C. § 408.

64. Having timely registered his copyright, Mr. Wolff is entitled to elect statutory damages under 17 USC § 412 and § 504(c), in an amount of not less than $750 or more than $30,000 per infringement.

65. Defendants' infringement was intentional. Newsweek systematically exploited Mr. Wolff's work and, on information and belief, other photojournalist's works beyond the scope of licenses granted to it. Indeed, even after receiving a cease and desist demand from Mr. Wolff, Newsweek refused to take down the Infringing Work. Its bullying, blustering, and misleading response is powerful evidence of the willfulness of its infringements, in addition to the original infringing conduct itself.

66. Because Defendants' copyright infringement was willful, and because Mr. Wolff registered his copyright prior to the infringing conduct, he is entitled to enhanced statutory damages pursuant to 17 U.S. Code § 504(c)(2) in the sum of up to one hundred fifty thousand dollars ($150,000).

67. Within the time permitted by law, Mr. Wolff will make his election between actual damages and profit disgorgement, or statutory damages, depending upon which is larger.

68. Prior registration also entitles Mr. Wolff to seek an award of attorney's fees pursuant to 17 USC § 412 and § 505 upon proving infringement.

## COUNT II

### *Mr. Wolff v. All Defendants*
### (Violation of Digital Millennium Copyright Act)

69. Mr. Wolff incorporates by reference all the allegations of paragraphs 1 through 68.

70. The Digital Millenium Copyright Act ("DMCA") prohibits intentionally removing or altering copyright management information ("CMI"), or distributing CMI knowing it has been removed or altered, "knowing, or ... having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title." 17 U.S.C. § 1202(b).  The DMCA defines CMI as information "conveyed in connection with copies" of a work.  17 U.S.C. § 1202(c)(1)-(8).  Copyright notices that are printed in connection with a photograph, but that do not appear in the photograph itself, are CMI for purposes of the DMCA.  *Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 305 (S.D.N.Y. 2011).

71. While the License Agreements required Newsweek to print copyright notices in connection with publication of the Protected Works, and while Newsweek complied with that duty when it originally published the works, when in 2014 it decided to make unlicensed re-use of one of Mr. Wolff's work it also removed the copyright notice printed in connection with the original cover.  Defendants intentionally removed CMI from the Protected Work then republished it knowing that they had removed or altered CMI without authority of the copyright owner or the law, and knowing that their misconduct would thereby enable, facilitate, or conceal their infringement of Mr. Wolff's rights.  Defendants had reasonable grounds to know that their removal of CMI would induce, enable, facilitate or conceal their infringement.

72. By removing CMI, Defendants also encouraged others to replicate Newsweek's infringement. The purpose of the notices, required by the License Agreements, was to give notice to the world that the images were not abandoned to the public domain, but were the property of a copyright owner. The purpose of the notices was to warn off both naïve infringers and calculating content pirates such as Newsweek became. One of the latter's first calculations after deciding to make unlicensed use of the Protected Works was to drop the tell-tale copyright notice it had agreed to print with the image.

73. After removing the copyright notice, Defendants damaged Mr. Wolff by illegally publishing the Infringing Work on the Newsweek.com website.

74. On information and belief, Defendants' actions were knowing, willful, reckless, and so warrant enhanced damages and penalties.

75. Mr. Wolff is entitled to recover an award of statutory damages for each violation of the DMCA in the sum of not less than $2,500 or more than $25,000 pursuant to 17 U.S.C.A. § 1203(c)(3).

76. Mr. Wolff is further entitled to its attorneys' fees and costs for violation of the DMCA pursuant to 17 U.S.C. §1203(b)(5).

## COUNT III

*Mr. Wolff v. IBT Media, Inc. and Does 1-10*
(Vicarious and/or Contributory Copyright Infringement)

77. Mr. Wolff incorporates by reference all the allegations of paragraphs 1 through 76.

78. Plaintiff is the author and owner of the copyrights to the Protected Works. The works at issue in this action are the subject of a valid Certificate of Copyright Registration issued by the Register of Copyrights.

79. On information and belief, IBT Media, Inc. and Does 1-10 knowingly induced, participated in, aided and abetted in, and profited from the illegal reproduction and distribution of the Protected Works.

80. On information and belief, IBT Media, Inc. and Does 1-10, if they were not direct infringers, knew or should have known of the infringing activity.

81. On information and belief, IBT Media, Inc. and Does 1-10 provided the site and means for such infringing activity to occur through Newsweek.com and the Newsweek Twitter feed and Facebook account knowing that the Infringing Work was the property of another.

82. Defendants have obtained direct and indirect profits they would not otherwise have realized but for the infringement of Mr. Wolff's rights in the Protected Work.

83. As a direct and proximate result of said acts of vicarious and contributory infringement, Mr. Wolff has suffered substantial damages in an amount to be proven at trial, as well as additional and special damages in an amount to be proven at trial.

84. Mr. Wolff is entitled to actual damages and disgorgement of direct and indirect profits realized by Defendants, and each of them, in an amount to be proven at trial or, at his election, statutory damages.

85. Because Defendants' copyright infringement was willful, Mr. Wolff is entitled to enhanced statutory damages in the sum of up to $150,000.

86. Within the time permitted by law, Mr. Wolff will make his election between actual damages and profit disgorgement, or statutory damages, depending upon which is larger.

87. Mr. Wolff is further entitled to its attorneys' fees and costs pursuant to 17 U.S.C. § 505.

## RELIEF

WHEREFORE, Mr. Wolff requests judgment against the Defendants for:

1. A finding that Defendants infringed Mr. Wolff's copyright interests in the Protected Work by copying and publishing it for commercial purposes without any license or consent;

2. A joint and several award of actual damages and disgorgement of all of Newsweek's profits attributable to the infringement, as provided by 17 U.S.C. §504, in an amount to be proven at trial or, in the alternative, at Mr. Wolff's election, statutory damages of $150,000 for willful infringement pursuant to 17 U.S.C. §504(c)(1) or (2), whichever is larger;

3. An order, pursuant to 17 U.S.C. 502(a), enjoining the Defendants from any infringing use of any of Mr. Wolff's works;

4. A joint and several award of Mr. Wolff's attorney's fees and costs pursuant to 17 U.S.C. §505.

5. A finding that Defendants violated the Digital Millennium Copyright Act, 17 U.S.C. 1202, by knowingly removing Plaintiff's copyright notice attached to the Protected Work;

6. A joint and several award of the actual damages, pursuant to 17 U.S.C.

§1203, suffered by Mr. Wolff as a result of the violation of the Digital Millennium Copyright Act, and profits of Defendants that are attributable to the violation and are not taken into account in computing the actual damages or, in the alternative, at Mr. Wolff's election, statutory damages in the maximum amount of $25,000 per infringement, as provided pursuant to 17 U.S.C. §1203, whichever is larger;

7. A joint and several award of Mr. Wolff's attorney's fees and costs pursuant to 17 U.S.C. §1203;

8. Pretrial interest as permitted by law;

9. A constructive trust be entered over any revenues or other proceeds realized by Defendants, and each of them, through their infringement of Mr. Wolff's intellectual property rights; and

10. Such other relief as the Court deems just and proper.

Respectfully submitted,

**SPECTOR GADON & ROSEN, P.C.**

By: s/ Bruce Bellingham bwb3210
Bruce Bellingham
David B. Picker
Pa. Bar Nos. 83503/65153
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8916
*bbellingham@lawsgr.com*
*dpicker@lawsgr.com*

April 5, 2016    *Attorneys for Plaintiff*